# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL RUBIN, Derivatively on Behalf of MATCH GROUP, INC., | Case No.: |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| JOSEPH M. LEVIN, AMANDA GINSBERG, ANN L. MCDANIEL, THOMAS J. MCINERNEY, GLENN H. SCHIFFMAN, PAMELA S. SEYMON, ALAN G. SPOON, MARK STEIN, GREGG WINIARSKI, and SHARMISTHA DUBEY, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| MATCH GROUP, INC., | |
| Nominal Defendant. | |

Plaintiff Michael Rubin, through his undersigned attorneys, brings this derivative action on behalf of Nominal Defendant Match Group, Inc. ("Match Group" or the "Company") against certain officers and directors of the Company. Plaintiff alleges the following upon personal knowledge with respect to himself and his own acts, and as to all other matters upon information and belief, based upon the substantial investigation of his counsel, including, among other things, an analysis of: (i) the Company's filings with the United States Securities and Exchange Commission ("SEC"); (ii) an action brought by the Federal Trade Commission (the "FTC") against the Company captioned *Federal Trade Commission v. Match Group, Inc.*, Case No. 3:19-cv-02281-K (N.D. Tex.); (iii) a federal securities class action lawsuit captioned *Crutchfield v. Match*

*Group, Inc., et al.*, Case No. 3:19-CV-2356-E (N.D. Tex.); and (iv) news articles, analyst reports, media reports, and other publicly available information.

## I.   NATURE OF THE ACTION

1.     This is a stockholder derivative action brought on behalf of nominal defendant Match Group to recover the damages caused by its directors' and officers' breaches of fiduciary duty and other misconduct and to cause the Company to implement and maintain an adequate system of internal controls and corporate governance practices and procedures.

2.     In its Annual Report on Form 10-K filed with the SEC on February 28, 2019 (the "2018 10-K"), Match Group disclosed that ***nearly two years priors to the filing*** of the 10-K the FTC commenced an investigation into the Company's practices on Match.com, one of the online dating sites it operates.

3.     On September 25, 2019, the FTC's investigation culminated in the agency's filing of a lawsuit against the Company for violations of the Federal Trade Commission Act ("FTCA") and the Restore Online Shoppers Confidence Act ("ROSCA").   The FTC alleged, among other things, that: (a) Match Group sent consumers misleading advertisements that tout communications from persons the Company identified as potentially fraudulent users of Match.com and led consumers to believe that the communications are from persons interested in establishing a dating relationship with them.   The purpose of doing so was to induce nonsubscribers to pay for a subscription since only subscribers may respond to communications; (b) Match Group exposed consumers to the risk of fraud by providing recent subscribers access to communications that the Company knew was likely to have been sent by persons engaging in fraud; (c) the Company guaranteed certain consumers a free six-month subscription renewal if they fail to "meet someone special" but failed to disclose the requirements of its "guarantee" adequately; (d) Match Group

misled consumers with a confusing and cumbersome cancellation process that causes consumers to believe that they have canceled their subscriptions when they have not; and (e) when consumers disputed charges with their credit card companies relating to any of these practices and lost the dispute, the Company denied consumers access to the service for which they had already paid.

4.      According to the FTC, the Company brazenly continued its misconduct even after being informed that the FTC was investigating.  In fact, the FTC alleges that the latter three categories of legal violations were engaged in by the Company through mid-2019.

5.      The misconduct pled in the FTC complaint subjected Match.com users to the material risks of fraud and deception, and the Company to the material risk of lawsuits, regulatory action, and reputational harm.  The Company's directors and officers were plainly on notice of these risks as they are expressly acknowledged in the Company's public filings.  Likewise, the failure to disclose the existence of the FTC investigation for nearly two years exposed the Company to material risks to its financial condition and business prospects.

6.      During the time that the FTC investigation was ongoing, but not disclosed publicly, certain directors and officers sold over eighty million dollars of their Match Group shares.  Indeed, Amanda Ginsberg ("Ginsberg"), the Company's Chief Executive Officer ("CEO"), sold 63% of her shares in August 2018 alone, reaping proceeds of over $5.8 million.

7.      As a result of the misconduct of its directors and officers, Match Group now faces substantial liability.  Not only has the Company been sued by the FTC, but in the wake of the filing of the FTC action a securities class action lawsuit was filed against the Company, Ginsberg, and its Chief Financial Officer ("CFO") Defendant Gary Swidler ("Swidler").

8.      The Match Group Board was repeatedly presented with red flags of misconduct, but failed to take action to prevent, or at least minimize, the damage that resulted to the Company and its shareholders therefrom.  Indeed, after its IPO, Match.com was named in consumer class

action litigation for practices similar to those alleged in the FTC Complaint and over 1,600 complaints were filed by consumers with the Better Business Bureau, the FBI's Internet Crime Complaint Center ("IC3"), and state attorneys general offices seeking to recover damages resulting from misconduct such as that flagged by the FTC.  Media reports in prominent publications, as well as an authoritative guide published by the Better Business Bureau, plainly cautioned online dating services of the proliferation of fraudulent accounts on such platforms.  Moreover, the FTC's commencement of an investigation into the Company's practices was a clear red flag that obligated the Match Group Board to act.  The Match Group Board, however, utterly failed to take notice of these red flags, and continued to, among other things, permit or authorize the Company to engage in such misconduct.

9.    Plaintiff brings this action derivatively to recover the damages suffered by Match Group as a result of the breaches of fiduciary duty of its directors and officers, and to effect changes to the Company's corporate governance practices and internal control procedures.  Plaintiff made no demand upon the Match Group Board before initiating this action since it would be a wasteful and futile act.  The Match Board consists of individuals who are neither disinterested nor independent since they are members of Match Group management, benefitted themselves through improper insider stock sales, face a substantial likelihood of liability for the misconduct described herein, and/or are otherwise deeply entangled and connected with IAC/InterActiveCorp ("IAC"), a holding company that owns 80% of Match Group's shares, or Barry Diller, IAC's controlling shareholder, so that there is reasonable doubt that they could act in a disinterested or independent manner.

## II.    VENUE AND JURISDICTION

10.    The Court has jurisdiction over the causes of action asserted under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated

thereunder by the SEC, pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act. Supplemental Jurisdiction over the remaining claims exists pursuant to 28 U.S.C. § 1367. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.   This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice, or served as a director or officer of a corporation duly incorporated under the laws of the State of Delaware.

12.   Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a) because: (i) Match Group is incorporated under the laws of the State of Delaware; and (ii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### III.   PARTIES

13.   Plaintiff Michael Rubin is a current owner of Match Group common stock, owned Match Group common stock at the time of the transactions complained of herein and has continuously owned such shares since the Company's Initial Public Offering (the "IPO") on November 19, 2015.

14.   Nominal Defendant Match Group is duly incorporated under the laws of the State of Delaware, with its principal place of business and executive offices at 8300 Douglas Avenue, Dallas, Texas 75225. Match Group is an internet company that provides dating products through websites it owns and operates. The Company operates a portfolio of brands including Match.com, Tinder, PlentyOfFish, Meetic, OkCupid, OurTime, and Pairs. As Match Group states in its Annual

Report on Form 10-K for the fiscal year ended December 31, 2017, filed with the SEC on March 1, 2018 (the "2017 10-K"), the Company relies on subscribers for the majority of its revenue.

> ***Our revenue is primarily derived directly from users in the form of recurring subscriptions,*** which typically provide unlimited access to a bundle of features for a specific period of time, and the balance from à la carte features, where users pay a non-recurring fee for a specific action or event.  Each of our brands offers a combination of free and paid features targeted to its unique community.

15.    Defendant Joseph M. Levin ("Levin") has served as Match Group's Chairman of the Board ("Chairman") since December 2017 and a director since October 2015.  Levin has also served as CEO of IAC, Match Group's controlling shareholder, since June 2015.  Levin also serves as Chairman of ANGI Homeservices Inc. ("ANGI") since it went public in September 2017 through the merger of Angie's List and IAC's HomeAdvisor.[1]  As the Company acknowledged in its Proxy Statement filed with the SEC on April 30, 2018 (the "2018 Proxy"), Levin is not independent by reason of his executive position at IAC.  During the relevant period, IAC paid Levin the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $1,000,000 | $5,000,000 | — | — | $315,554 | $6,315,554 |
| 2017 | $1,000,000 | $4,000,000 | — | $7,662,000 | $378,729 | $13,040,729 |
| 2016 | $1,000,000 | $2,500,000 | $4,037,000 | $2,580,000 | $358,980 | $10,475,980 |

16.    Defendant Amanda Ginsberg ("Ginsberg") has served as Match Group's CEO since August 2017 and a director since December 2017.  On January 28, 2020, Ginsberg announced that she would be stepping down from the CEO position as of March 1, 2020.  Previously, Ginsberg

---

[1] IAC owns over 80% of ANGI shares.

was the CEO of Match Group Americas from December 2015 to August 2017; CEO of The Princeton Review from July 2014 to December 2015; CEO of Tutor.com from April 2013 to 2015; SVP and General Manager ("GM") of Match.com from September 2008 to October 2012; and Vice President ("VP") and GM of Chemistry.com from March 2006 to September 2008. As the Company acknowledged in the 2018 Proxy, Ginsberg is not independent by reason of her executive position at Match Group. During the relevant period, Match Group paid Ginsberg the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $750,000 | $1,750,000 | — | — | $8,250 | $2,508,250 |
| 2017 | $517,808 | $750,000 | $4,109,000 | $6,280,570 | $23,650 | $11,681,028 |

17. Defendant Ann L. McDaniel ("McDaniel") has served as a Match Group director since December 2015. She is the Chairperson of the Company's Compensation and Human Resources Committee. During the relevant period, Match Group paid McDaniel the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $75,000 | $249,999 | $324,999 |
| 2017 | $75,000 | $249,984 | $324,984 |
| 2016 | $75,000 | $249,997 | $324,997 |

18. Defendant Thomas J. McInerney ("McInerney") has served as a Match Group director since the Company's IPO in November 2015. He serves on the Board's Audit Committee. Previously, McInerney served as the President of Retailing at IAC from January 2003 through December 2005; and VP and CFO of IAC from January 2005 to March 2012. McInerney was EVP and CFO of Ticketmaster Online-City Search Inc. ("Ticketmaster") from May 1999 to

January 2003.[2]   During the relevant period, Match Group paid McInerney the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $60,000 | $249,999 | $309,999 |
| 2017 | $60,000 | $249,984 | $309,984 |
| 2016 | $60,000 | $249,997 | $309,997 |

19.   Defendant Glenn H. Schiffman ("Schiffman") has served as a director of Match Group since September 2016.  Schiffman is the EVP and CFO of IAC since April 2016; a director of ANGI since September 2017; and was the CFO of ANGI from September 2017 to March 2019. As the Company acknowledged in the 2018 Proxy, Schiffman is not independent by reason of his executive position at IAC.   During the relevant period, IAC paid Schiffman the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $600,000 | $3,500,000 | — | $4,315,200 | $149,612 | $8,564,812 |
| 2017 | $600,000 | $2,500,000 | — | $3,831,000 | $46,059 | $6,977,059 |
| 2016 | $420,000 | $1,750,000 | — | $2,942,000 | $225,586 | $5,337,586 |

20.   Defendant Pamela S. Seymon ("Seymon") has served as a director of Match Group since the Company's IPO.   Seymon is a member of the Board's Audit Committee and Compensation and Human Resources Committee.  During the relevant period, Match Group paid Seymon the following compensation:

---

[2] IAC was the parent company of Ticketmaster at that time.

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $65,000 | $249,999 | $314,999 |
| 2017 | $65,000 | $249,984 | $314,984 |
| 2016 | $65,000 | $249,997 | $314,997 |

21.    Defendant Alan G. Spoon ("Spoon") has served as a Match Group director since the Company's IPO in November 2015.  He is the Chairperson of the Board's Audit Committee. Spoon also has served as an IAC director since February 2003, where he also serves as Chairperson of the Audit Committee.  Spoon was also a Ticketmaster director from September 1998 to January 2003.  During the relevant period, Match Group paid Spoon the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $80,000 | $249,999 | $329,999 |
| 2017 | $80,000 | $249,984 | $329,984 |
| 2016 | $80,000 | $249,997 | $329,997 |

22.    Defendant Mark Stein ("Stein") has served as a Match Group director since the Company's IPO.  Stein also serves as a director of ANGI since September 2017.  He is also the EVP and Chief Strategy Officer ("CSO") of IAC since January 2016.  Previously, Stein served as CSO of Mindspark Interactive Network, an IAC company, from 2009 to 2012.  Stein has also served in various executive positions at IAC, including SVP of Corporate Development from May 2004 to July 2005.  As the Company acknowledged in its 2018 Proxy, Stein is not independent by reason of his executive position at IAC.  During the relevant period, IAC paid Stein the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $550,000 | $2,000,000 | — | — | $8,250 | $2,558,250 |
| 2017 | $550,000 | $1,500,000 | — | $3,831,000 | $24,213 | $5,905,213 |
| 2016 | $550,000 | $1,000,000 | — | $1,935,000 | $7,950 | $3,492,950 |

23.   Defendant Gregg Winiarski ("Winiarski") has served as a Match Group director since October 2015 (before the Company's IPO).  Winiarski has also served as an ANGI director since September 2017; and as IAC's EVP, Secretary and General Counsel ("GC") since February 2014.  Previously, Winiarski was IAC's Associate GC from February 2005 to February 2009.  As the Company acknowledged in its 2018 Proxy, Winiarski is not independent by reason of his executive position at IAC.   During the relevant period, IAC paid Winiarski the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $500,000 | $2,000,000 | — | — | $8,250 | $2,508,250 |
| 2017 | $500,000 | $1,750,000 | — | $2,554,000 | $8,100 | $4,812,100 |
| 2016 | $500,000 | $1,250,000 | — | $1,290,000 | $7,950 | $3,047,950 |

24.   Defendant Sharmistha Dubey ("Dubey") has served as the President of Match Group since January 2018 and a director since September 2019.  Previously, Dubey was the Chief Operating Officer of Tinder from February 2017 to January 2018; President of Match Group Americas from December 2015 to January 2018; Chief Product Officer of The Princeton Review and Tutor.com from July 2014 to December 2015; Executive Vice President of Tutor.com from April 2013 to July 2014; Chief Product Officer of Match.com from January 2013 to April 2013;

and Senior Vice President of Match.com and Chemistry.com from September 2008 to December 2012. During the relevant period, Match Group paid Dubey the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $550,000 | $1,500,000 | $11,999,986 | — | $8,250 | $14,058,236 |

25.    According to the 2019 Proxy, Match Group is a "controlled company" since non-party IAC beneficially owns equity securities of Match Group representing approximately 97.5% of the total voting power of Match Group capital stock.  IAC is the Company's majority shareholder, owning more than 80% of the outstanding shares.

26.    Non-party Barry Diller ("Diller") has been a director and Chairman and Senior Executive of IAC since December 2010.  Diller has previously served as a director and Chairman and CEO of IAC (and its predecessors) from August 1995 to November 2010.  In IAC's Proxy Statement filed with the SEC on April 30, 2019, IAC's Board of Directors expressly recognized Diller's substantial influence over IAC resulting from his share ownership:  "the Board noted Mr. Diller's ability to exercise influence (subject to the Company's organizational documents and Delaware law) over the outcome of matters involving the Company that require stockholder approval given the fact that he and certain members of his family collectively have sole voting and/or investment power over all shares of IAC Class B common stock outstanding, which shares represent a significant percentage of the voting power of IAC capital stock."

27.    The Defendants named in ¶¶ 14-24 are referred to herein as the "Individual Defendants."

## IV.    THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

28.     By reason of their positions as officers and/or directors of Match Group and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed and owe the Company and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and were and are required to control and manage the Company in a just, honest, fair, and equitable manner.  Each of the Individual Defendants owed and owes Match Group and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

29.     To discharge their duties, the Individual Defendants were and are required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and internal controls of Match Group.  By virtue of such duties, the Individual Defendants were and are required to follow the Company's Code of Business Conduct and Ethics. In addition, the Individual Defendants serving on the Board's two standing committees, the Audit Committee and the Compensation and Human Resources Committee, are further obligated to uphold the special duties set forth in the charters for each respective committee.

## A.   Match Group's Code of Business Conduct and Ethics

30.     Match Group's Code of Business Conduct and Ethics was adopted by the Board to serve as a framework under which the Board is required to fulfill its duties with expertise, integrity, and an understanding of the Company's business environment.  Violations of Match Group's Code of Business Conduct and Ethics are punishable by penalties and/or termination of employment.

31.     As required by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Individual Defendants were and are required to refrain from engaging in misconduct, and to claw back compensation from officers engaged in knowing misconduct, including violations of applicable law and NASDAQ rules.  The Individual Defendants were and are obligated to file full, accurate, and timely reports and public communications with the SEC.

32.    Among the duties imposed by the Code of Business Conduct and Ethics are:

- Maintaining complete and accurate Company records;

- The prohibition against trading stock by persons who are aware of material nonpublic information;

- Seeking approval from Match Group's General Counsel before any director or officer can engage in transactions involving Company securities;

- Being a good "corporate citizen" by complying with applicable governmental laws, rules and regulations;

- Maintaining full, fair, accurate, timely and understandable reports and documents filed with the SEC and in all public communications;

- Refraining from sharing material nonpublic information about Match Group or any public company with others; and

- Maintaining confidentiality of information entrusted "by the Company and/or IAC."

**B.    Additional Duties of the Audit Committee Members**

33.    In addition to the duties described above, the members of the Board's Audit Committee (Chairperson Spoon, McInerney, and Seymon) are responsible for "the compliance by the Company with legal and regulatory requirements."

34.    The Audit Committee Charter obligates members to review and discuss with management and the Company's independent auditor the integrity and accuracy of the Company's financial statements and public disclosures.

35.    The Audit Committee Charter provides that the Audit Committee shall meet at least four times each year and make regular reports to the Board to ensure Match Group's public filings with the SEC are in compliance with the law.  The Charter further provides that the members of the Audit Committee shall, among other things:

- Review all related party transactions in accordance with the Audit Committee's formal, written policy;

- Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters; and

- Discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.

36.    The Audit Committee Charter further provides that each member shall meet the independence and experience requirements of the marketplace rules of the NASDAQ and Rule 10A-3(b)(1) under the Securities and Exchange Act of 1934 ("the Exchange Act").

**C.    Additional Duties of the Compensation and Human Resources Committee Members**

37.    The Compensation and Human Resources Committee Charter requires its members to be independent under NASDAQ rules, "outside" directors as defined by the Internal Revenue Code 162(m), and "non-employee" directors under Rule 16b-3 of the Exchange Act.  Match Group's Compensation and Human Resources Committee is comprised of Defendant McDaniel (Chairperson) and Defendant Seymon, who are responsible for approving and evaluating the Company's executive compensation plans, policies, and programs.  The Committee is also tasked with, *inter alia*:

- Reviewing and discussing the Compensation Discussion and Analysis required to be included in the Company's Proxy Statement and Annual Report on Form 10-K;

- Producing the annual Compensation Committee report to be included in the proxy; and

- Oversight of the Company's compliance with SEC rules and regulations regarding shareholder advisory votes on executive compensation, the frequency of such votes, and NASDAQ rules that, with limited exceptions, shareholders approve equity compensation plans.

### V.    SUBSTANTIVE ALLEGATIONS

## A.   Background

### 1.   IAC's control over Match Group

38.   Match Group operated as a wholly-owned subsidiary of IAC since its incorporation in 2009.  As a result, IAC has provided Match Group with various services, including accounting, treasury, legal, tax, risk management, corporate support and internal audit functions.  Match Group has also borrowed money from (and issued related notes to) certain IAC subsidiaries, whose borrowings are classified as long-term debt.

39.   On November 19, 2015, Match Group became a public corporation after launching its IPO.  Despite the public offering of shares, Match Group continues to be controlled by IAC, as admitted in the 2018 10-K:

> Match Group has outstanding shares of common stock, with one vote per share, and shares of Class B common stock, with ten votes per share and which are convertible into common stock on a share for share basis. ***As of February 1, 2019, IAC owned 209,919,402 shares of Class B common stock representing 100% of our outstanding Class B common stock and 15,813,277 shares of common stock. These holdings collectively represent approximately 81.1% of our outstanding shares of capital stock and approximately 97.6% of the combined voting power of our outstanding capital stock.***

### 2.   The material risks facing Match Group's business

40.   Match Group's Board is required to exercise oversight over the Company's risk management programs and policies.  As stated in the Company's 2018 Proxy:

> [T]he imprudent acceptance of risks or the failure to appropriately identify and mitigate risks could adversely impact stockholder value. ***The Board is responsible for overseeing Company management in the execution of its responsibilities and for assessing the Company's approach to risk management***. The Board exercises these responsibilities periodically as part of its meetings and through discussions with Company management, as well as through the Board's Audit and Compensation and Human Resources Committees, which examine various components of financial and compensation-related risks, respectively, as part of their responsibilities. Information security is a key component of risk management at Match Group and our Chief Technology Officer briefs the Audit Committee each quarter, and the full Board as appropriate, on the Company's information security program and its related priorities and controls. ***In addition, an overall review of***

> *risks is inherent in the Board's consideration of the Company's long-term strategies and in the transactions and other matters presented to the Board*, including significant capital expenditures, acquisitions and divestitures and financial matters.

41.   Among the material risks to the Company over which the Board was required to exercise oversight was the risk that user conduct could damage the Company, its reputation, and business prospects.  According to the 2018 10-K:

> *The reputations of our brands may be adversely affected by the actions of our users* that are deemed to be hostile, offensive, defamatory, inappropriate or unlawful. While we have systems and processes in place that aim to monitor and review the appropriateness of the content accessible through our dating products, which include, in particular, reporting tools through which users can inform us of such behavior on the platform, and have adopted policies regarding illegal, offensive or inappropriate use of our dating products, our users could nonetheless engage in activities that violate our policies.  These safeguards may not be sufficient to avoid harm to our reputation and brands, especially if such hostile, offensive or inappropriate use is well-publicized.

> In addition, *it is possible that a user of our products could be physically, financially, emotionally or otherwise harmed by an individual that such user met through the use of one of our products.  If one or more of our users suffers or alleges to have suffered any such harm, we could experience negative publicity or legal action that could damage our reputation and our brands*.  Similar events affecting users of our competitors' dating products could result in negative publicity for the dating industry generally, which could in turn negatively affect our business.

42.   The Company's Board was also expressly aware of the risk that illegal conduct on its platform could result in lawsuits, regulatory action or future legislation that could damage the Company's financial condition and business prospects.  Indeed, the 2018 10-K warns that inquiries or investigations may lead to costly compliance measures, an impediment in developing new products, negative publicity, increased operating costs, require significant management time and attention, and subject the Company to remedies that may harm its business, "including fines or demands or orders that [Match Group] modify or cease existing business practices."

43.   The 2018 10-K further states the risks that Match Group faces from legal proceedings:

*We are, and from time to time may become, subject to litigation and various legal proceedings*, including litigation and proceedings related to intellectual property matters, *privacy and consumer protection laws*, as well as stockholder derivative suits, *class action lawsuits and other matters*, that involve claims for substantial amounts of money or for other relief or that might necessitate changes to our business or operations…. The defense of these actions is time consuming and expensive…. *Our failure to successfully defend or settle any of these litigations or legal proceedings could result in liability that, to the extent not covered by our insurance, could have an adverse effect on our business, financial condition and results of operations.*

**B.     Match Group is Sued by the FTC for Deceiving Consumers and Violating ROSCA**

**1.     The FTC commences an investigation of Match Group in March 2017**

44.     The 2018 10-K disclosed that, in March 2017, almost two years prior to its filing, the FTC asked Match Group for information and documents as part of its civil investigation into Match.com's business practices.  Specifically, the FTC commenced an investigation regarding Match.com's marketing, charge reversal and user account cancellation practices.

**2.     After the FTC investigation commences, but before disclosure, insiders sell over $82 million of their Match Group shares**

45.     After commencement of the FTC's investigation, Match Group insiders began selling shares without making public disclosure of the investigation.  Indeed, in August 2018, Defendant Ginsberg sold 63% of her Match Group shares, netting over $5.8 million.  All told, Defendants Ginsberg, McDaniel, and Dubey, as well as Gregory Blatt ("Blatt"), a member of the Board until his August 2018 resignation, Jared Sine ("Sine"), the Company's Chief Legal Officer and Secretary, Sam Yagan ("Yagan"), a member of the Board until his September 2019 resignation, Philip D. Eigenmann ("Eigenmann"), the Company's Chief Accounting Officer, and Amarnath Thombre ("Thombre"), the CEO of Match Group Americas, sold at least 3,418,334 Match Group shares for proceeds of more than $82.75 million while in possession of material adverse non-public information concerning the FTC's investigation of the Company, as well as the misconduct alleged herein:

17

| Name | Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|---|
| **Amanda Ginsberg** | 8/14/2018 | 106,850 | $48.20-$50.08 | $5,275,129.86 |
| | 8/21/2018 | 11,196 | $48.78 | $546,165.51 |
| *Subtotal* | | 118,046 | $48.20-$50.08 | $5,821,295.37 |
| | | | | |
| **Ann L. McDaniel** | 11/27/2017 | 11,119 | $30.62 | $340,432.65 |
| | 2/27/2018 | 5,676 | $40.09 | $227,527.00 |
| | 5/25/2018 | 4,351 | $41.85 | $182,090.66 |
| *Subtotal* | | *21,146* | *$30.62-$41.85* | *$750,050.30* |
| | | | | |
| **Gary Swidler** | 2/15/2018 | 52,841 | $41.53 | $2,194,692.81 |
| | 2/16/2018 | 37,248 | $41.56 | $1,547,851.81 |
| | 8/23/2018 | 105,611 | $49.57 | $5,235,538.59 |
| | 2/11/2019 | 158,795 | $57.88 | $9,191,038.72 |
| *Subtotal* | | *354,495* | *$41.53-$57.88* | *$18,169,121.94* |
| | | | | |
| **Sharmistha Dubey** | 2/12/2018 | 141,149 | $37.99 | $5,361,714.14 |
| | 2/13/2019 | 39,773 | $57.60 | $2,291,095.82 |
| *Subtotal* | | *180,922* | *$37.99-$57.60* | *$7,652,809.97* |
| | | | | |
| **Gregory Blatt** | 3/2/2018 | 220,177 | $39.30 | $8,652,163.46 |
| | 3/2/2018 | 236,496 | $40.09 | $9,482,023.32 |
| *Subtotal* | | *456,673* | *$39.30-$40.09* | *$18,134,186.79* |
| | | | | |
| **Amarnath Thombre** | 5/5/2017 | 200,000 | $19.37 | $3,874,000.00 |
| | 5/8/2017 | 75,000 | $19.05 | $1,428,750.00 |
| | 5/9/2017 | 25,000 | $19.05 | $476,250.00 |
| | 5/16/2017 | 50,000 | $19.79 | $989,500.00 |
| | 5/22/2017 | 50,000 | $19.56 | $978,000.00 |
| | 5/23/2017 | 66,126 | $19.69 | $1,302,020.94 |
| *Subtotal* | | *466,126* | *$19.05-$19.79* | *$9,048,520.94* |
| | | | | |
| **Jared F. Sine** | 8/30/2017 | 64,436 | $20.46 | $1,318,257.46 |
| | 2/12/2018 | 9,953 | $38.19 | $380,072.23 |
| | 8/20/2018 | 27,343 | $48.51 | $1,326,356.98 |
| | 2/11/2019 | 13,764 | $57.76 | $794,993.50 |
| *Subtotal* | | *115,496* | *$20.46-$57.76* | *$3,819,680.17* |
| | | | | |
| **Sam Yagan** | 8/16/2017 | 54,625 | $19.31 | $1,054,803.29 |
| | 8/25/2017 | 14,463 | $19.01 | $274,908.37 |
| | 8/28/2017 | 84,391 | $19.11 | $1,613,108.65 |

|  |  |  |  |  |
|---|---|---|---|---|
|  | 8/31/2017 | 464,963 | $21.76 | $10,119,547.72 |
|  | 9/1/2017 | 219,620 | $22.34 | $4,906,925.74 |
| *Subtotal* |  | *838,062* | *$19.01-$22.34* | *$17,969,293.76* |
|  |  |  |  |  |
| **Philip D. Eigenmann** | 2/16/2018 | 10,816 | $41.72 | $451,242.44 |
|  | 3/1/2018 | 7,081 | $39.94 | $282,791.06 |
|  | 2/13/2019 | 11,409 | $57.77 | $659,076.25 |
| *Subtotal* |  | *29,306* | *$39.94-$57.77* | *$1,393,109.76* |
|  |  |  |  |  |
| **Total** |  | *2,580,272* | *$19.05-$57.88* | *$82,758,068.98* |

### 3.   Match Group discloses the March 2017 FTC investigation in February 2019

46.   On February 28, 2019, in the 2018 10-K, the Individual Defendants disclosed for the first time that Match Group was under investigation by the FTC.  The newly disclosed investigation had been going on since at least March 2017, nearly two years prior to its disclosure.  In fact, in November 2018, the FTC offered to settle its claims with Match Group for $60 million and a consent judgment mandating certain changes in the Company's business practices; however, the two sides could not reach an agreement.  As stated in the 2018 10-K:

> In March 2017, the Federal Trade Commission ("FTC") requested information and documents in connection with a civil investigation regarding certain business practices of Match.com.  In November 2018, the FTC proposed to resolve its potential claims relating to Match.com's marketing, chargeback and online cancellation practices via a consent judgment mandating certain changes in the company's business practices, as well as a payment in the amount of $60 million.  Match Group believes that the FTC's legal challenges to Match.com's practices, policies, and procedures are without merit and is prepared to vigorously defend against them.

47.   On August 7, 2019, the FTC voted to bring claims against Match Group.

48.   On September 18, 2019, Yagan resigned as a member of the Match Group Board.  No reason was given for Yagan's departure.  Defendant Dubey was elected by the Board to fill the vacancy created by Yagan's departure.

### 4.   Insiders continue to sell Match Group shares

**prior to the filing of the FTC Complaint**

49.   From the time that the FTC's ongoing investigation was belatedly announced to the public through the time of the filing of the FTC's complaint, Match Group insiders continued to sell Company shares.  All told, during that time period, Defendants Ginsberg, and McDaniel, as well as Chief Legal Officer Sine, and Chief Accounting Officer Eigenmann, sold at least 162,305 Match Group shares for proceeds of $11,640,676.82 while in possession of material adverse non-public information concerning the FTC's investigation of the Company, as well as the misconduct alleged herein:

| Name | Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|---|
| **Amanda Ginsberg** | 5/30/2019 | 119,879 | $69.05 | $8,277,920.67 |
| | | | | |
| *Subtotal* | | *119,879* | *$69.05* | *$8,277,920.67* |
| | | | | |
| **Ann L. McDaniel** | 6/5/2019 | 6,400 | $70.26 | $449,648.00 |
| | | | | |
| *Subtotal* | | *6,400* | *$70.26* | *$449,648.00* |
| | | | | |
| **Philip D. Eigenmann** | 6/6/2019 | 4,328 | $70.87 | $306,705.45 |
| | 8/16/2019 | 7,057 | $84.49 | $596,245.93 |
| | | | | |
| *Subtotal* | | *11,385* | *$70.87-$84.49* | *$902,951.38* |
| | | | | |
| **Jared F. Sine** | 8/14/2019 | 6,153 | $79.47 | $488,971.53 |
| | 8/15/2019 | 18,488 | $82.28 | $1,521,185.24 |
| | | | | |
| *Subtotal* | | *24,641* | *$79.47-$82.28* | *$2,010,156.77* |
| | | | | |
| **Total** | | *162,305* | *$69.05-$84.49* | *$11,640,676.82* |

**5.   The FTC files a complaint against Match Group in September 2019**

50.   On September 25, 2019, the FTC filed a complaint, captioned *FTC v. Match Group, Inc.*, No. 3:19-cv-02281-K (N.D. Tex.), for a permanent injunction, civil penalties, and other relief

against Match Group in the United States District Court for the Northern District of Texas (the

"FTC Complaint").   On September 26, 2019, the DOJ served Match Group with a grand jury

subpoena for documents relating to the marketing-related claims made by the FTC in its complaint.

51.   In its complaint, the FTC alleges a long history of misconduct by the Company

involving, among other things: communications delivered to nonsubscribers, but withheld from

subscribers, from accounts that Match Group had deemed fraudulent; Match Group's creation of

a cancellation process for subscribers that was all but impossible to complete; Match Group's use

of a "negative option" whereby subscriptions were renewed without any affirmative act from the

subscriber without clear disclosure; and Match Group's termination of active accounts held by

those who unsuccessfully challenged their charges with credit card companies.   The FTC alleges

that Match Group continued this misconduct even after learning of the FTC's investigation.   The

FTC charges the Company with violating Section 5(a), 5(m)(1)(A), 13(b), and 19 of the FTC Act,

15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

**(a)  Use of communications from illegitimate users to
    generate deceptive advertisements and sell subscriptions**

52.   While nonsubscribers can receive messages on Match.com, they cannot send or

respond to messages, only subscribers may do so.   The FTC alleges that unsuspecting

nonsubscribers were induced to pay for a subscription so they could see and reply to

communications that were forwarded to them by Match Group.   However, the FTC alleges that

many of these messages forwarded by Match Group to nonsubscribers were from accounts that the

Company had identified as likely to be fraudulent and that Match Group provided no disclosure of

that determination to the consumer.

53.   The FTC Complaint asserts that consumers are often unaware that communications

received through Match.com are not from users interested in establishing dating relationships but

are instead from persons seeking to perpetrate scams.  For example, in some months between 2013 and 2016, more than half of instant message initiations and favorites that consumers received originated from accounts that Match Group identified as "fraudulent," meaning that the Company determined the Match.com user was likely to be perpetrating some form of scam.

54.   Match Group used these fraudulent communications to induce consumers to subscribe to Match.com.  When consumers received these communications, they also received accompanying advertisements from the Company encouraging them to subscribe to Match.com in order to view the content of the communication and the identity of the sender.   These advertisements did not disclose whether Match Group had identified the Match.com user as likely to attempt to defraud the consumer receiving the message or as requiring further review by the Company's fraud review process due to the likelihood that the user is engaging in fraud. Consumers also receive discount offers for subscription packages at reduced prices that similarly represent expressly that specific Match.com users are interested in them.

55.   The FTC alleges that consumers have often purchased Match.com subscriptions from the Company so that they can communicate with the users Match Group has advertised as being interested in them.

56.   Between at least 2013 and mid-2017, Match Group tracked the number of fraud-generated personalized advertisements it sent to nonsubscribers and those advertisements' effect on Match.com subscriber numbers.  In fact, Match Group has consistently tracked how many subscribers these communications have generated, typically by measuring the number of consumers who subscribe to Match.com within 24 hours of receiving an advertisement that touts a fraudulent communication.  From June 2016 to May 2018, for example, Match Group's analysis found that 499,691 subscription packages were purchased by nonsubscribers within 24 hours after receiving fraud-generated communications between June 2016 and May 2018.

22

**(b) Match Group exposes users to the risk of fraud by marketing communications from users that it knew likely to be engaging in fraud**

57.     The FTC Complaint asserts that Match Group is aware that these communications reach consumers and automatically generate personalized advertisements encouraging them to subscribe to Match.com.

58.     Between 2013 and mid-2018, the FTC asserts, Match Group delivered email from fraud-flagged users to nonsubscribers while withholding them from subscribers until it had completed its fraud review.  Without this practice, the vast majority of fraud-flagged Match.com users would never have been able to contact their intended recipients.

59.     The FTC asserts that based upon data it obtained from Match Group, from at least June 2016 to at least the beginning of May 2018, approximately 2.25 million users received approximately 4 million fraudulent messages that would not have been delivered had the recipients been paid subscribers.  Regarding those communications that were withheld by Match Group based upon its determination of their fraudulent nature, approximately 87.8 percent were later confirmed by the Company to be fraudulent.  More than 250,000 of those consumers subscribed to Match.com within 24 hours of receiving the email communications.

**(c) Match Group's use of deceptive guarantees**

60.     The Company offered a "Guarantee" that promised a free six-month subscription to consumers who did not find a match within six months of buying a Match.com subscription.  The FTC alleges that Match Group did not adequately disclose the terms of that offer.  According to the FTC, due to Match Group's failure to clearly disclose the guarantee requirements and have a clearly outlined procedure for claiming six free months of Match.com, most users could not claim their guarantee.  Thus, from 2013 through at least 2016, users bought almost 2.5 million subscriptions with the guarantee, but only 32,438 received the promised six free months.  In

contrast, Match Group billed nearly 1 million consumers who purchased a guarantee for an additional six-month package when the first six-month period expired.

### (d) Match Group's billing and cancellation practices for Match.com

61.   The FTC also alleged that Match maintained an online cancellation mechanism for its subscription service that was burdensome and confusing to complete.  From at least 2013 through at least 2016, Match Group billed nearly 1 million users for six additional months after their initial subscription period ended.  As a result, users were faced with bills for an extended six-months of Match.com subscriptions after their initial subscriptions expired due to Match Group's negative option marketing, which the FTC found to be in violation of ROSCA.[3]  According to the FTC, thousands of users complained that Match Group billed them after they thought they had cancelled their subscriptions.

62.   Match Group acknowledged its frustrating cancellation procedures in a 2015 internal presentation obtained by the FTC and pled in the FTC Complaint.  According to the internal presentation, a user seeking to terminate a paid membership needed to go through at least six steps and even then may not have terminated the membership.   Notes from the internal presentation cited in the FTC Complaint describe the cancellation process as:

> hard to find, tedious, and confusing.  Members often think they've cancelled when they have not and end up with unwanted renewals.  The current process takes over 6 clicks.

63.   The FTC Complaint further alleges that Match Group executives have acknowledged that Match.com's cancellation process is "convoluted and confusing."   The

---

[3] "An offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  FTC Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w).

Company's head of customer service stated in 2016, for example, that "it's been the same complaint for the past decade that I've been with Match…. It takes up to 7 or 8 clicks to complete the flow to turn off [subscriptions] if you can even figure out how to do it."

64.    As such, the FTC alleges that "[t]housands of consumers have complained about Match.com's cancellation procedures. They have also claimed that [Match Group] has billed them after they believed they effectively canceled their Match.com subscriptions."

### (e)  Match Group terminated accounts in response to billing disputes

65.    Due to Match Group's deceptive advertising, billing, and cancellation practices, users sometimes disputed their Match.com charges. If Match Group prevailed in the dispute, it would then cancel the user's account even if there was time remaining on the paid subscription. The FTC charges Match Group with engaging in unfair practices against consumers regarding this termination practice, employed until at least mid-2019.

66.    As a result of the foregoing, the FTC is seeking penalties from Match Group, including rescission or reformation of contracts, restitution to consumers, the refund of monies paid, and the disgorgement of ill-gotten monies, as well as injunctive relief.

67.    On October 3, 2019, a securities class action lawsuit was filed in the United States District Court for the Northern District of Texas seeking damages from the Company, and Defendant Ginsberg and Gary Swidler, the Company's Chief Financial Officer. The complaint, captioned *Crutchfield v. Match Group, Inc., et al.* (Case No.: 3:19-CV-2356-E), alleges violations of Section 10(b) and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act.

### C.    The Board Was Faced with Red Flags of Improper Conduct

68.    The Individual Defendants were on notice of numerous red flags of improper conduct that required that they investigate and take action to remediate them. Rather than take

such required actions, the Individual Defendants allowed the problems to persist and fester, resulting in material damage to Match Group and its shareholders.

69.    On June 3, 2011, before Match Group went public, a class of consumers sued Match.com for violating § 17.59(a)(3) of the Texas Deceptive Trade Practices Act, breach of contract, and breach of the implied covenant of good faith and fair dealing.  The lead plaintiffs in the class action, captioned *David Robison, et al. v. Match.com, LLC.,* No. 3:10-cv-02651-L (N.D. Tex.), sought to recover damages for subscription fees they paid for Match.com.  Specifically, the consumers alleged that Match.com breached its subscriber agreement by, among other things:

- failing to vet new profiles;

- failing to accurately disclose its active and reachable subscriber base;

- failing to police its site from the proliferation of false and fraudulent profiles;

- failing to take reasonable steps to remove and block scammers, even after certain profiles had been reported; and

- failing to review and/or audit a percentage of new profiles rather than automatically accepting them without further review.

70.    From January 4, 2013 until Match Group's IPO on November 19, 2015, at least 584 complaints were filed with the Better Business Bureau, the FBI's IC3, and state attorneys general offices.  These complaints, stemming from consumers located in 46 states, the District of Columbia, Puerto Rico, and Canada, alleged damages ranging up to $400,000 resulting from fraudulent users whose communications were forwarded to them by Match.com, the inability to cancel memberships on Match.com, the improper negative option employed by Match.com, and the improper termination of services for users who unsuccessfully disputed their charges with credit card companies.

71.    Numerous media reports alerted the Defendants to the high frequency of fraud on online dating sites.  For example, in a *Wall Street Journal* article entitled "Dating-Website Users

Fall Prey to Fraudster Profiles," the FBI's IC3 reported that in the first six months of 2016, romance scams cost victims nearly $120 million, up 23% year-over-year.[4]  One former Match.com worker, Mark Swindell, stated that Match.com outsourced the new-user approval process to the Dominican Republic where workers had quotas for screening pictures and usually took less than a minute to review each one.

72.    From the time of Match Group's November 19, 2015 IPO until the commencement of the FTC's investigation in March 2017, at least 912 complaints were filed with the Better Business Bureau, the FBI's IC3, and state attorneys general offices.   These complaints, stemming from consumers located in 40 states, the District of Columbia, Canada, the United Kingdom, and Australia, alleged damages ranging up to $326,000 resulting from fraudulent users whose communications were forwarded to them by Match.com, the inability to cancel memberships on Match.com, the improper negative option employed by Match.com, and the improper termination of services for users who unsuccessfully disputed their charges with credit card companies.

73.    From the time of the commencement of the FTC investigation of Match Group in March 2017 through December 2017, the last date upon such data is publicly available, at least 742 complaints were filed with the Better Business Bureau, the FBI's IC3, and state attorneys general offices. These complaints, stemming from consumers located in 46 states, the District of Columbia, and Canada, alleged damages ranging up to $450,000 resulting from fraudulent users whose communications were forwarded to them by Match.com, the inability to cancel

---

[4] Jennifer Levitz, *Dating-Website Users Fall Prey to Fraudster Profiles*, Wall Street Journal, September 1, 2016, https://www.wsj.com/articles/dating-website-users-fall-prey-to-fake-profiles-1472680583.

memberships on Match.com, the improper negative option employed by Match.com, and the improper termination of services for users who unsuccessfully disputed their charges with credit card companies.

74.     On February 2, 2018, the Better Business Bureau released the findings of a study entitled, "Online Romance Scams," which detailed how scammers use impersonation, blackmail, and trickery to steal from unsuspecting daters (the "BBB Study").  The purpose of the BBB Study was to provide "dating services with knowledge needed to avoid this widespread and devastating fraud."

75.     The BBB Study "revealed a massive number of fraudsters are using [dating] sites to gain unsuspecting people's trust to steal their money….  Victims in the US and Canada have reported losing nearly $1 billion over the last three years – and BBB suspects this is only the tip of the iceberg, as most people do not file complaints with BBB or law enforcement."  The BBB Study also found that "more can, and should be done to stop the fraud, protect businesses' reputations, and provide help for those whose lives have been destroyed."

76.     The BBB Study cites an expert who estimates that "at any one time there may be 25,000 fraudsters online with victims."  The BBB Study notes that "[o]ne company that screens profiles for dating companies says that 500,000 of the 3.5 million profiles it scans every month are bogus."  Based upon its work, the "BBB estimates that there may be more than a million victims in the U.S. alone."

77.     The BBB Study notes that, while there are tens of thousands of complaints regarding dating sites, "[c]omplaint numbers … do not provide a reliable guide to the true scope of the online romance scam epidemic.  Victims may not even know they are fraud victims for some time, and when they do find out, they are so devastated that they never file a formal complaint, or do not know where to go to file a complaint, so these stories do not become part of a national

database.  Furthermore, FTC studies show that less than 10% of all fraud victims report it to [the Better Business Bureau] or law enforcement."

78.   The study listed some practices that online dating companies need to utilize in order to limit fraud:

- Noting the use of IP addresses from places that do not match a profile;

- Warn customers about romance scams;

- Screen, identify, and remove profiles used for scams;

- When a fake profile is detected, the company should remove it and notify all accounts that have been in contact; and

- Take consumer complaints or direct romance fraud victims to law enforcement and the Better Business Bureau.

79.   On May 2, 2018, a consumer class action lawsuit was filed against Match Group, captioned *Matthew Ditnes v. Match Group, LLC*, Case No. 1:18-cv-03128 (N.D. Ill.).  According to the complaint, the plaintiff was inundated with messages from fake profiles created or allowed to be created by the Company: "[w]hile Match purports to have 'millions' of active subscribers, upon information and belief, well over half of the profiles on its site are fake and fraudulent profiles.  These types of profiles are unreachable by legitimate users attempting to avail themselves of the services offered by Match and paid for via subscription fees."

80.   According to the *Ditnes* complaint, the fake accounts on Match help drive up subscription numbers, which helps the Company market subscriptions for Match.  The complaint alleges that "well over half of the profiles on [Match Group's] sites are fake and fraudulent profiles."  Further, Match Group makes "little to no effort to vet, police, or remove [what appear to be thousands of fake and fraudulent profiles] and thereby permits, condones, and acquiesces in their posting."

## VI.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81.    Plaintiff will adequately and fairly represent the interest of Match Group and its stockholders in enforcing and prosecuting their rights.

82.    Plaintiff seeks to redress injuries suffered and to be suffered by the Company as a direct result of the violations of fiduciary duty by the Individual Defendants, as well as aiding and abetting.

83.    Plaintiff did not demand that Match Group's Board take the action requested herein because doing so would constitute a wasteful, futile and useless act.  The Defendants, individually and in concert, breached their fiduciary duties of good faith, loyalty, and due care, and were derelict in the performance of their fiduciary duties to manage Match Group fairly, justly, honestly, and equitably.  Further, the Individual Defendants face a substantial likelihood of liability for the misconduct alleged herein.  Moreover, personal conflicts of interest faced by a majority of the current directors raise reasonable doubt as to whether these individuals can act independently and impartially.

84.    The Individual Defendants knew of or disregarded the lack of internal controls over, among other things, fraudulent accounts, cancellation policies, anti-fraud policies, and disclosure requirements.  Notwithstanding the obvious risks posed to Match Group and its shareholders from a material weakness in such internal controls, the Individual Defendants failed to ensure that corporate actions were being taken for the benefit of the Company and its shareholders rather than to benefit themselves, that material information was disclosed in compliance with SEC rules and regulations, failed to comply with the Company's own Code of Business Conduct and Ethics, failed to hold the Company's directors, officers, and employees accountable for their violations of the federal securities laws, insider trading and the Company's own policies, failed to ensure that an effective system of internal controls was implemented and maintained, and failed to perform their proper level of oversight duties as directors of the Company.

85.     A majority of the Board faces a substantial likelihood of liability for breaches of fiduciary duty for the alleged misconduct that cannot be exculpated due to their participation in or approval of the wrongs alleged herein and/or failures to comply with the Company's Code of Business Conduct and Ethics.  Further, they cannot be said to be independent from each other or from those facing a substantial likelihood of liability.  At all relevant times, the Board participated in the misconduct alleged herein or did not perform the proper level of oversight over the Company in accordance with their fiduciary duties.

86.     The Match Group Board consists of ten (10) directors.  A majority of these directors are neither disinterested nor independent, and face a substantial likelihood of liability for their breaches of fiduciary duties described herein.  As such, they cannot make an impartial decision as to whether to institute legal proceedings against those alleged to have committed wrongdoing.  Therefore, demand would be futile as to at least a majority of Match Group's directors.

**A.     Defendant Ginsberg Is Neither Disinterested Nor Independent**

87.     Defendant Ginsberg is the CEO of Match Group.  As an officer of Match Group she is neither disinterested nor independent.  Indeed, the Company acknowledged in the 2018 Proxy that Ginsberg is not independent by reason of her executive position at Match Group.  Ginsberg has been employed in various executive roles by Match Group since 2006.

88.     Further, Defendant Ginsberg improperly benefitted by the improper scheme described herein.  Ginsberg, while in possession of material, adverse information that the FTC was investigating the Company's practices, and without disclosure of the investigation to the Company's stockholders and the investing public, sold 237,925 Match Group shares for proceeds of $14,099,216.

89.     Ginsberg is also named as a defendant in the securities class action lawsuit.

**B.    Defendant Dubey Is Neither Disinterested Nor Independent**

90.    Defendant Dubey is the President of Match Group.  As an officer of Match Group, she is neither disinterested nor independent.  Indeed, Dubey has been employed in various executive roles by Match Group since 2006.

**C.    Defendants Levin, Stein, Winiarski, and Schiffman
       Are Neither Disinterested Nor Independent**

91.    Defendants Levin, Stein, Winiarski, and Schiffman are all members of IAC's management:  Levin is the CEO, Stein is an EVP and CSO, Winiarski is the EVP, Secretary and General Counsel, and Schiffman is an EVP and CFO.  As members of IAC's management, Defendants Levin, Stein, Winiarski, and Schiffman are neither disinterested nor independent. Indeed, the Company acknowledged in the 2018 Proxy that Levin, Stein, Winiarski, and Schiffman are not independent by reason of their executive positions at IAC.

92.    Defendants Levin, Stein, Winiarski, and Schiffman are further entangled in that they are also members of the Board of ANGI:  Levin is the Chairman and CEO, while Stein, Winiarski, and Schiffman are directors.

93.    In Match Group's S-1/A Registration Statement (the "Registration Statement") for its IPO, the risk related to IAC's control of Match Group is expressly acknowledged.  Through its control, IAC has the ability to control "significant corporate activities," including "the election of our board of directors and, through our board of directors, decision-making with respect to our business direction and policies…."  The Registration Statement further acknowledges that, as a result of IAC's control, Match Group "may take actions that stockholders other than IAC do not view as beneficial."

94.    The Registration Statement also recognizes that "IAC's interest may conflict with our interests and the interests of our stockholders."  It is admitted in the Registration Statement

that "[v]arious conflicts of interest between us and IAC could arise.  Five of our eight directors are current members of the board of directors or executive officers of IAC.  Ownership interests of directors or officers of IAC in our stock and ownership interests of our directors and officers in the stock of IAC, or a person's service as either a director or officer of both companies, could create or appear to create potential conflicts of interest when those directors and officers are faced with decisions relating to our company."  Among those conflicts of interest listed is "the impact that operating decisions for our business may have on IAC's consolidated financial statements." The Registration Statement expressly acknowledges that "[p]otential conflicts of interest could also arise if we decide to enter into any new commercial arrangements with IAC in the future…" and that "disputes may arise between IAC and us relating to our past and ongoing relationship, … including those related to: … sales or other disposal by IAC of all or a portion of its ownership interest in us."

95.     On August 7, 2019, as part of its second quarter 2019 release of financial results, IAC announced that it is considering the spin-off of its stake in Match Group.  Thus, IAC has an interest that conflicted with the long-term interests of Match Group and its stockholders.  On December 19, 2019, Match Group announced its entry into a definitive agreement providing for the full separation of Match Group from the remaining businesses of IAC, which is expected to close in the second quarter 2020.  In the press release, Diller was quoted as stating "[w]e've always separated out our businesses as they've grown in scale and maturity…", thus, acknowledging that IAC's conflicting interest with the long-term interests of Match Group and its stockholders existed during the entire relevant time period herein.

**D.     Defendant Seymon Is Neither Disinterested Nor Independent**

96.     Defendant Seymon was a partner at the law firm Wachtell Lipton Rosen & Katz ("WLR&K"), which has a lengthy relationship, and has derived substantial revenue from,

representing IAC in corporate matters and related litigation.  Indeed, a March 12, 2008 *Reuters* article described Seymon as an "IAC lawyer."  A February 27, 2014 article on Littlesis, a grassroots watchdog network "connecting the dots between the world's most powerful people and organizations," reported that Seymon has "long been a key lawyer to Barry Diller, the Ticketmaster chairman and CEO of IAC at the time" and that "[n]obody could be happier to serve Diller's deal addiction than Wachtell, Lipton, Rosen & Katz, particularly Martin Lipton and *Pamela Seymon*, who have handled many of the deals.  The firm has been representing the media mogul and his many companies for *more than 15 years*, and *more work appears to be on the way*."

97.   It was reported on December 2, 2010 in the *AM Law Daily* that Pamela Seymon led a team from Wachtell in advising IAC on a transaction with Liberty Media.  The article noted that "*Seymon* and Wachtell have advised IAC before, serving as deal counsel to the conglomerate's Ticketmaster unit on its controversial takeover by Live Nation last year."

98.   WLR&K served as counsel to Match Group in its November 2015 IPO.  WLR&K has also served as counsel to the Company in its August 15, 2016 exchange offer for senior notes, as well as the registration of new senior notes.  As indicated by a May 26, 2017 letter to Match Group attached to the Registration Statement on Form S-8 filed by Match Group with the SEC on May 26, 2017, WLR&K "have acted as counsel to Match Group, Inc. … in connection with the preparation and filing of the Registration Statement on Form S-8 … to be issued pursuant to the Company's 2017 Stock and Annual Incentive Plan."  WLR&K served as counsel for IAC's January 2018 offering of IAC common stock to certain holders of senior notes and the Registration Statement on Form S-3 filed with the SEC on January 22, 2018 lists the same attorney from WLR&K as listed on Match Group's IPO Registration Statement, and other Registration Statements described above.

99.   WLR&K represented Defendant Spoon in *In re IAC/InteractiveCorp Securities Litigation*, 1:04-cv-07447-RJH (S.D.N.Y.).

**E.   Defendant Spoon Is Neither Disinterested Nor Independent**

100.   Defendant Spoon is neither disinterested nor independent.  Spoon is a director of IAC, where four Match Group directors (Levin, Stein, Winiarski, and Schiffman) serve as members of management.

101.   Spoon's involvement with IAC spans back for many years.  In fact, Spoon was a Ticketmaster director from September 1998 through January 2003.  While Spoon was a Ticketmaster director, Defendant McInerney served as an EVP and CFO from May 1999 to January 2003.

102.   Defendant Spoon was also the President, Chief Operating Officer, and a director of The Washington Post Company.  Defendant McDaniel was the managing editor of Newsweek and head of its Washington bureau at the time that Spoon was a director and officer of Newsweek's parent corporation, The Washington Post Company.

103.   Defendant Spoon and Diller, the controlling shareholder of IAC, are enumerated as one of the "five most-entangled controller-independent director pairings" in the University of Richmond School of Law's publication "Beyond Beholden," published in 2019 by Da Lin, a Climenko Fellow and Lecturer on Law at Harvard Law School.  According to the publication, Spoon has served as a director of four (4) entities controlled by Diller:  Ticketmaster, where Spoon was a director and a special committee member from 1997 to 2002; The HealthCentral Network, where Spoon was a director from 2005 to 2011; IAC, where Spoon was a director from 2003 to the present; and Match Group.  The article concludes, based upon an extensive study, that "some controlling shareholders regularly re-appoint cooperative 'independent' directors to senior positions and directorships at other firms under their control.  From a director's perspective, this

pattern of behavior means that the potential upside of getting along with the controlling shareholder is significant."

104. Defendant Spoon was represented by WLR&K in *In re IAC/InteractiveCorp Securities Litigation*, 1:04-cv-07447-RJH (S.D.N.Y.).

## F.   Defendant McInerney Is Neither Disinterested Nor Independent

105. Defendant McInerney was the Executive Vice President and Chief Financial Officer of IAC from January 2005 to March 2012.  As such, he has a long-standing connection with Barry Diller, IAC's controlling shareholder, Chairman and former CEO, as well as Defendants Levin, Stein, Winiarski, Schiffman, and Spoon.

106.  Defendants McInerney and Spoon served together at Ticketmaster: McInerney was its EVP and CFO from May 1999 to January 2003.  Spoon was a Ticketmaster director from September 1998 through January 2003.

## G.   Defendant McDaniel Is Neither Disinterested Nor Independent

107. Defendant McDaniel previously served as Senior Vice President of Graham Holdings Company ("Graham Holdings"), and its predecessor companies from June 2008 to April 2015.  McDaniel is currently a consultant to Graham Holdings.  Diller, until his resignation on January 11, 2017, was a director of Graham Holdings and a member of the Compensation Committee of the Board.  As such he was responsible for reviewing and approving the compensation of McDaniel and other members of Graham Holdings' senior management (including, among other elements of compensation, annual base salary, annual incentive opportunities and long-term incentive opportunities), as well as overseeing the administration and determination of awards under Graham Holdings' compensation plan.

108. Further, Defendant McDaniel improperly benefitted by the improper scheme described herein.  McDaniel, while in possession of material, adverse information that the FTC

was investigating the Company's practices, and without disclosure of the investigation to the Company's stockholders and the investing public, sold 27,546 Match Group shares for proceeds of $1,199,698.30.

## H.   The Individual Defendants Face a Substantial Likelihood of Liability

109.   The Individual Defendants have participated in, known, disregarded and/or directly benefitted from the wrongs complained of herein.

110.   Match Group has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein.  The Individual Defendants have not attempted to recover the damages the Company has suffered or will suffer thereby.  Further, the Individual Defendants have not taken any action against the parties responsible for the wrongdoing alleged and permitted them to continue to officiate in the same capacities as they served at the time of the wrongdoing alleged.

111.   Each of the Individual Defendants faces a substantial likelihood of liability for his or her own individual misconduct.  Each had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company were complete and accurate.  Each was faced with red flags of improper conduct, but failed to take action to prevent, or at least minimize, the damages to Match Group and its shareholders caused thereby.  Each failed to ensure that material information was timely disclosed, rather than concealed, and that proper and adequate internal controls and governance procedures were implemented and maintained.

112.   The Individual Defendants owed and continue to owe a further duty to ensure that information about the effectiveness of the Company's internal controls was and is accurate, that disclosure controls and procedures were and are effective, and that material changes in risk factors were and are disclosed.  Further, the Individual Defendants were and are obligated to oversee the

internal governance and accounting controls and procedures to ensure that SEC filings accurately reflected the Company's true financial condition and business prospects.

113. Moreover, the Individual Defendants comprising the Audit Committee and Compensation and Human Resources Committee either participated in or turned a blind eye to the scheme complained of herein. They also failed to make certain that adequate controls and procedures were in place to prevent such an illegal scheme from being perpetrated to the detriment of the Company and its shareholders.

114. These Defendants, if demand were made of them, would have to evaluate whether to sue themselves and/or their fellow directors in evaluating the wrongdoing alleged and the request to bring an action for their breaches of fiduciary duties. There is reasonable doubt that this is something they would or could do. Therefore, these Defendants cannot act in a manner necessary to preserve their independence and disinterest.

## I.     Demand is Futile as to the Audit Committee Defendants

115. The Audit Committee directors (Chairperson Spoon, McInerney, and Seymon) also cannot fairly consider a demand with the required disinterest and independence by virtue of their own violations of the federal securities laws and breaches of fiduciary duties.

116. The members of the Audit Committee lack independence and disinterest because they, among other things, violated their duties mandated by the Audit Committee Charter; namely, oversight of: (i) the Company's accounting and financial reporting; (ii) internal control systems; (iii) the performance of the Company's internal audit function and independent auditor; and (iv) ensuring compliance with legal and regulatory requirements.

117. The members of the Audit Committee were faced with red flags of improper conduct in violation of legal and regulatory requirements, but failed to take action to prevent, or at least minimize, the damage caused to the Company and its stockholders thereby.

**J.     Demand is Futile as to the Compensation and
        Human Resources Committee Defendants**

118.  The Compensation and Human Resources Committee Defendants (Chairperson McDaniel and Seymon) were and are required by its Charter to assist the Board in fulfilling its responsibilities relating to the compensation of executives and directors, but in violation of their fiduciary duties, these Defendants failed to perform that required role.

119.  Match Group has been materially damaged by the misconduct of its directors and officers, but the Compensation and Human Resources Committee has not disclosed any action that it has taken to recoup any of those damages from those responsible or to adjust the compensation of any directors and officers in light of their participation in the misconduct specified herein.

**K.     Demand is Futile as to the Individual Defendants for Additional Reasons**

120.  Match Group's Board has already demonstrated that it cannot consider a pre-suit demand to bring the claims set forth herein with the required disinterest and independence.  The Board has taken no action to address the harm the Individual Defendants' misconduct has caused the Company.

121.  Further, in order to bring this action for breach of fiduciary duties, the members of the Match Group Board would be required to sue themselves and/or their fellow directors and officers with whom they have entangling alliances, interests, and dependencies, which they would not do.  As such, the Individual Defendants cannot act in a disinterested and independent manner in considering a demand.

122.  Finally, demand would be futile because publicly traded companies, such as Match Group, typically carry director and officer liability insurance from which Match Group could potentially recover some or all of its losses.  However, such insurance typically contains an

"insured vs. insured" disclaimer that would foreclose a recovery therefrom if the Company sues to recover its damages from the Individual Defendants.  As such, demand is futile.

## COUNT I

**(Violations of Section 14(A) of the Exchange Act Against the Individual Defendants)**

123.  Plaintiff incorporates by reference and realleges each and every above allegation as though fully set forth herein, except for allegations of reckless or knowing or fraudulent conduct by the Defendants, which are not referred to or incorporated for the purpose of this claim.

124.  The Section 14(a) Exchange Act claim alleged herein is based solely on negligence. The Section 14(a) Exchange Act claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, knowing conduct or recklessness regarding these non-fraud claims.

125.  The Individual Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders in the 2018 Proxy and 2019 Proxy.  The 2018 Proxy and 2019 Proxy each contained a description of the Company's oversight of risk management.  The 2018 Proxy states:

> Company management is responsible for assessing and managing the Company's exposure to various risks on a day-to-day basis, which responsibilities include the creation of appropriate risk management programs and policies. Company management has developed and implemented guidelines and policies to identify, assess and manage significant risks facing the Company. In developing this framework, the Company recognized that leadership and success are impossible without taking risks; however, the imprudent acceptance of risks or the failure to appropriately identify and mitigate risks could adversely impact stockholder value. The Board is responsible for overseeing Company management in the execution of its responsibilities and for assessing the Company's approach to risk management. The Board exercises these responsibilities periodically as part of its meetings and through discussions with Company management, as well as through the Board's Audit and Compensation and Human Resources Committees, which examine various components of financial and compensation-related risks, respectively, as part of their responsibilities. Information security is a key component of risk

management at Match Group and our Chief Technology Officer briefs the Audit Committee each quarter, and the full Board as appropriate, on the Company's information security program and its related priorities and controls.  In addition, an overall review of risks is inherent in the Board's consideration of the Company's long-term strategies and in the transactions and other matters presented to the Board, including significant capital expenditures, acquisitions and divestitures and financial matters. The Board's role in risk oversight of the Company is consistent with the Company's leadership structure, with the Chief Executive Officer and other members of senior management having responsibility for assessing and managing the Company's risk exposure, and the Board and its committees providing oversight in connection with those efforts.

The Company's Proxy Statement filed with the SEC on or about April 30, 2019 makes a nearly identical representation regarding the Company's risk management processes.  The descriptions provided in the 2018 Proxy and 2019 Proxy failed to disclose that the Company's internal controls were inadequate, and that the Board was not composed of members who could effectively perform oversight duties and had failed to provide appropriate risk oversight of the Company's activities.  By reason of the conduct alleged herein, the Individual Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Match Group misled and/or deceived its stockholders by making misleading statements and omissions that were an essential link in its stockholders heeding Match Group's recommendation to approve the election of certain individuals to the Board.

126. The misleading information contained in the 2018 Proxy and 2019 Proxy was material to Match Group's stockholders in determining whether to elect certain individuals to the Board.  The solicitation process in connection with the 2018 Proxy and 2019 Proxy was an essential link in the approval of the election of these individuals to the Board.

127. Plaintiff, on behalf of Match Group, seeks relief for damages inflicted upon the Company, as well as injunctive relief, based upon the misleading Proxy in connection with the election of certain individuals to the Board.

## COUNT II

**(Breach of Fiduciary Duties Against the Individual Defendants)**

128.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

129.  Each Defendant owed Match Group and its shareholders the highest duties of loyalty, honesty, candor and care in conducting their affairs.

130.  At a minimum, to discharge these duties each Defendant should have exercised reasonable and prudent supervision over the governance, management, policies, practices, controls, procedures and financial affairs of the Company and to make sure that their own interests were subservient to those of the Company.  When significant wrongdoing arises, such as that occurred here, the Board is required to initiate disciplinary action.

131.  The Individual Defendants also each owed a duty to ensure that at all times (i) corporate actions were taken in furtherance of the Company's interests and not the personal interests of its directors and/or officers; (ii) the Company's financial information was honestly reported; (iii) disclosures were complete and accurate and did not omit material information necessary to make the disclosures complete and accurate; (iv) proper accounting practices were in place; and (v) public statements made by the Company were not false and misleading.

132.  The Individual Defendants should be required to remunerate Match Group for its damages and disgorge any and all gains unjustly obtained at the expense of Match Group and its shareholders as a result of the Individual Defendants' breaches of their fiduciary duties.

133.  Accordingly, Plaintiff seeks on behalf of Match Group monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT III

**(Unjust Enrichment Against the Individual Defendants)**

134.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

135.  By their wrongful acts, violations of law, and false and misleading statements and omissions of material facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Match Group.

136.  The Individual Defendants either benefitted financially from their improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to their false and misleading statements, or received bonuses, stock options, or similar compensation from Match Group that was tied to the performance or artificially inflated valuation of the Company, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

137.  Plaintiff, as a shareholder and a representative of Match Group, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits – including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation – obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## **COUNT IV**

### **(Derivatively Against All Defendants for Aiding and Abetting)**

138.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

139.  Each of the Defendants (other than nominal defendant Match Group) acted and is acting with knowledge of or with disregard to the fact that the Defendants are in breach of their fiduciary duties to Match Group and have participated in a conspiracy in breach of fiduciary duties.

140.  In committing the wrongful acts alleged herein, each of the Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with

and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

141.  The Defendants collectively and individually initiated a course of conduct that was designed to and did violate the federal securities laws, authorize corporate actions to serve their own personal interests rather than the interests of the Company and its shareholders, misrepresent material facts about the Company, its financial condition and business prospects, prevent the disclosure of material information necessary to make statements complete and accurate, and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

142.  The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

143.  Each of the Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

144.  Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.      Declaring that the Plaintiff may maintain this action derivatively on behalf of Match Group and that Plaintiff is an adequate representative;

B.      Declaring that the Defendants have breached their fiduciary duties to Match

Group, and/or aided and abetted the breach of their fiduciary duties as alleged herein;

C.     Awarding money damages against all Defendants, jointly and severally, for the losses and damages suffered as a result of the acts and transactions complained of herein.

D.     Directing Defendants, jointly and severally, to account for all losses and/or damages sustained by Match Group by reason of the acts and omissions complained of herein;

E.     Requiring Defendants to remit to Match Group all of their salaries and other compensation received for the periods when they breached their duties;

F.     Ordering equitable and/or injunctive relief as permitted by law, equity, and statutory provisions sued hereunder;

G.     Awarding pre-judgment and post-judgment interest as allowed by law;

H.     Awarding Plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

I.     Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 28, 2020                    **RIGRODSKY & LONG, P.A.**

                                            By:   */s/ Brian D. Long*
                                                  Seth D. Rigrodsky (#3147)
                                                  Brian D. Long (#4347)
                                                  Gina M. Serra (#5387)
**OF COUNSEL:**                                   300 Delaware Avenue, Suite 1220
                                                  Wilmington, DE 19801
**WEISSLAW LLP**                                  Telephone: (302) 295-5310
David C. Katz                                     Facsimile: (302) 654-7530
Mark D. Smilow                                    Email: sdr@rl-legal.com
1500 Broadway, Suite 1600                         Email: bdl@rl-legal.com
New York, New York  10036                         Email: gms@rl-legal.com
Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010                        *Attorneys for Plaintiff*
dkatz@weisslawllp.com